# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46445-4-II |
| Respondent, | |
| v. | |
| RYAN EFFINGER, | PUBLISHED IN PART OPINION |
| Appellant. | |

MELNICK, J. — Ryan Effinger appeals his convictions for five counts of felony violation of a no contact order. He argues that his right to a public trial and his right to be present at all critical stages of his trial were violated when the trial court held sidebars for the peremptory and the for cause challenges. Effinger also argues that improper opinion testimony on his guilt constituted a manifest error affecting a constitutional right, that the court abused its discretion by imposing a discretionary $100 domestic violence fee, and that he received ineffective assistance of counsel because his counsel failed to object to the opinion testimony or to the discretionary domestic violence fee.

In the published portion of this opinion, we conclude that in light of our Supreme Court's recent decision in *State v. Love*, 183 Wn.2d 598, 354 P.3d 841 (2015), *cert. denied*, 136 S. Ct. 1524 (2016), the sidebars did not constitute a court closure and that the trial court did not violate Effinger's right to a public trial or his right to be present for all critical stages of his trial. In the unpublished portion of this opinion, we decline to consider Effinger's opinion testimony and legal

financial obligation (LFO) claims because he failed to preserve them for appeal. We also conclude Effinger's ineffective assistance of counsel claims fail because he cannot demonstrate prejudice. We affirm.

FACTS

Effinger was arrested after threatening his wife while a no contact order was in place. He then continued to contact her while in custody. The State charged Effinger with one count of burglary in the first degree, three counts of felony violation of a post-conviction no contact order, one count of felony harassment, five counts of felony violation of a pretrial no contact order, and one count of assault in the fourth degree, each with a domestic violence aggravator.

I.      JURY VOIR DIRE

During voir dire, the trial court first asked the potential jurors several questions regarding their ability to remain fair and impartial. The potential jurors answered these questions in open court. Many of the potential jurors were either in law enforcement or had family members who were.

The attorneys then conducted voir dire. The trial court explained the role of a sidebar to the jury:

> So I'm going to at this point give you a little definition for what's called a sidebar. And a sidebar is right over here to my left, your right. Sometimes I invite the attorneys to come up to sidebar here. And when I do that, it may look to you like we don't want you to hear what we're talking about. And that actually is quite true. That's why I have them come up here. I can tell you that it's easier and quicker for me to do that if I have a quick question for them, rather than send all of you out into the hallway.
>       So at this point I'm going to invite the attorneys up to sidebar for a quick conversation. If you'd like, ladies and gentlemen, you can feel free to stand up and stretch. You can talk quietly amongst yourselves, but please don't talk about the case. Thank you.
>       (A[n] unreported discussion was held at sidebar.)

Report of Proceedings (RP) (May 19, 2014) at 69.

After conducting a sidebar and after asking the venire another question, the trial court conducted another sidebar to allow the parties to exercise for cause challenges and to excuse jurors for hardship. That procedure was not transcribed, but it occurred in open court. After the sidebar, the trial court announced in open court that nine jurors, identified as jurors 4, 6, 9, 12, 13, 18, 22, 26, and 35, were excused. The trial court then conducted another unrecorded sidebar to allow the parties to exercise their peremptory challenges. Following the third sidebar, the trial court announced the composition of the jury. The trial court then swore in the jurors who were to hear the case.

All of the sidebars were memorialized on a case information sheet.[1] The sheet indicated that jurors 4, 6, 12, 13, 18, and 22 were excused for cause. It also indicated that the trial court excused juror 23 for cause, but the court did not announce that result in open court. The sheet showed that jurors 9 and 26 were struck for hardship and that 35 was struck because the number was not reached; however, the trial court had already excused juror 35 after the second sidebar. The trial court filed the case information sheet, and it is a part of the record.

The jury found Effinger guilty of five counts of felony violation of a no contact order, each with domestic violence aggravators. Effinger appeals.

---

[1] The case information sheet lists all potential jurors and has columns showing the jurors who were excused for hardship, for cause, by plaintiff's peremptory challenge, or by defendant's peremptory challenge. It also shows the jurors and the alternates sworn to the panel, and those not reached.

ANALYSIS

I.      RIGHT TO PUBLIC TRIAL

Effinger argues that a violation of his right to a public trial occurred when the trial court conducted sidebars for the parties' for cause and peremptory challenges. We disagree.

A.      Legal Principles

We utilize a three-step framework to analyze public trial challenges. *Love*, 183 Wn.2d at 605. First, we determine if the public trial right attached to the proceeding at issue. *Love*, 183 Wn.2d at 605. Second, if the right attached, we determine whether the courtroom was closed. *Love*, 183 Wn.2d at 605. There are two types of closure: "'when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave,'" *Love*, 183 Wn.2d at 606 (quoting *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011)), and when "a portion of a trial is held someplace 'inaccessible' to spectators, usually in chambers." *Love*, 183 Wn.2d at 606 (quoting *Lormor*, 172 Wn.2d at 93). Third, if the appellant established there was a closure, we determine whether the closure was justified. *Love*, 183 Wn.2d at 605. The trial court must have either conducted a *Bone-Club* analysis[2] on the record or the record must otherwise show that the court "effectively weighed the defendant's public trial right against other compelling interests." *State v. Smith*, 181 Wn.2d 508, 520, 334 P.3d 1049 (2014).

"The appellant carries the burden on the first two steps; the proponent of the closure carries the third." *Love*, 183 Wn.2d at 605. Whether the trial court has violated a defendant's right to a public trial is a question of law we review de novo. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011).

---

[2] *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995).

4

B.      Closure Inquiry

First, it is clear that for cause and peremptory challenges implicate the public trial right. *Love*, 183 Wn.2d at 605.  Where prior cases set a clear precedent, we need not engage in a full "experience and logic" analysis.  *Love*, 183 Wn.2d at 605.  Effinger satisfies the first prong of the test.

Second, no closure occurred here when the parties struck jurors at sidebars, even though the sidebars were not transcribed.  In *Love*, our Supreme Court held that no closure occurred under similar circumstances.  183 Wn.2d at 605-07.  Love argued that the possibility spectators at his trial could not hear the discussion about for cause challenges or see the juror sheet used for peremptory challenges rendered this portion of his trial inaccessible to the public.  *Love*, 183 Wn.2d at 606.  Unpersuaded by Love's argument, the court held that

> the public had ample opportunity to oversee the selection of Love's jury because no portion of the process was concealed from the public[.] . . . [O]bservers could watch the trial judge and counsel ask questions of potential jurors, listen to the answers to those questions, see counsel exercise challenges at the bench and on paper, and ultimately evaluate the empaneled jury.  The transcript of the discussion about for cause challenges and the struck juror sheet showing the peremptory challenges are both publically available.  The public was present for and could scrutinize the selection of Love's jury from start to finish, affording him the safeguards of the public trial right missing in cases where we found closures of jury se[le]ction.  We hold the procedures used at Love's trial comport with the minimum guarantees of the public trial right and find no closure here.

*Love*, 183 Wn.2d at 607 (citations omitted).  Finally, the court held that "written peremptory challenges are consistent with the public trial right so long as they are filed in the public record." *Love*, 183 Wn.2d at 607.

Effinger's case is similar to *Love*.  In *Love*, the lawyers exercised peremptory challenges silently in the courtroom by exchanging a written list of jurors between themselves.  183 Wn.2d at 602.  In Effinger's case, the parties silently exercised peremptory challenges at sidebar so people

5

in the courtroom could not hear. In both cases, the records included the case information sheets showing those jurors who were excused. *Love*, 183 Wn.2d at 603. We conclude that the sidebar peremptory challenges, even though not transcribed, do not constitute a closure. Consistent with *Love's* holding, we conclude that the written peremptory challenges here were filed in the public record for the public to scrutinize, satisfying Effinger's public trial right.

Additionally, in this case and in *Love*, questioning of the potential jurors took place in open court for everyone to hear and observe. *Love*, 183 Wn.2d at 602. Likewise, the jurors' answers to the questions occurred in open court. In our case, as in *Love*, the court held a sidebar to discuss for cause challenges. *Love*, 183 Wn.2d at 602. In both, the sidebar was visible to observers in the courtroom. *Love*, 183 Wn.2d at 602. As in *Love*, although the record is silent as to what the public could hear, it is clear here that the trial court did not ask anybody to leave the courtroom. *Love*, 183 Wn.2d at 602. Further, after the sidebars, both courts excused jurors who had been questioned in front of the defendant and the public. *Love*, 183 Wn.2d at 602-03. In open court and on the record, the trial courts read the names of some of the jurors who were excused. *Love*, 183 Wn.2d at 603-04. And, the trial courts here, and in *Love*, empaneled the jury in open court. *Love*, 183 Wn.2d at 604. We conclude that the for cause challenges at sidebar did not constitute a closure.

Effinger argues that because the court did not announce which party challenged which juror or for what reason, his right to a public trial was violated. This argument is without merit. Effinger cites no authority for either proposition. "We do not consider conclusory arguments unsupported by citation to authority." *State v. Mason*, 170 Wn. App. 375, 384, 285 P.3d 154 (2012); RAP 10.3(a)(6); RAP 10.4. The dissent also cites no authority to support an alternate conclusion. Moreover, the case information sheet, combined with the court's oral excusing of jurors, contains most of this information.

6

In addition, it is only when an adverse party excepts to a party's for cause challenge on sufficiency grounds that a trial on the for cause challenge occurs. CrR 6.4(d). There is no requirement that an attorney state the basis in open court when requesting that a potential juror be excused for cause. *See* CrR 6.4. Likewise, there is no requirement that a trial court announce its reasons for excusing a juror for cause. CrR 6.4, RCW 4.44.150-.190. Unchallenged dismissals of jurors for cause are proper.

Effinger has pointed us to no case law, and we have not found any, that states the basis for a for cause challenge must be stated on the record. Effinger is conflating concepts. Voir dire must occur in open court, but the reason for excusal need not be stated in open court. Likewise, the dissent states that there is a closure because the reasons for the for cause challenges are not apparent from the record. The dissent cites no authority for its proposition that the reasons for the challenge must be apparent on the record or a closure exists. This assertion leads to an illogical conclusion: there would be a closure of the court anytime a party challenged a juror for cause out loud in open court without stating a reason if the challenge was granted without opposition. There is no precedent that the public must be explicitly told the basis for every juror's excusal. Nor is there a requirement that the challenge be made in terms that are readily understood by the public.

Effinger further contends that public access to a sheet of paper does not remedy the lack of public access to the sidebar. Although no transcript of what transpired at the sidebars exists, there is a public record, the case information sheet, of what occurred. And the public and Effinger could observe the entire voir dire process. Like the situation in *Love*, the "public was present for and could scrutinize the selection of Love's jury from start to finish." *Love*, 183 Wn.2d at 607. The

case information sheet, in combination with the public voir dire, and the court's oral excusals of potential jurors, preserved the record for the public to review.[3]

We are mindful that, as the dissent in this case points out, in *Love*, the court made note of the fact that the sidebar was recorded and the public would have access to a transcript of what transpired. 183 Wn.2d at 607. However, the fact that it was recorded is not dispositive of whether or not an open court violation occurred. If it were, the court would not have found closures in many cases, including *State v. Brightman*, 155 Wn.2d 506, 511, 515-18, 122 P.3d 150 (2005) (trial court excluded observers during voir dire but the court reporter had a transcription of jury selection); *Irby*, 170 Wn.2d at 878, 883 (trial court conducted a portion of jury selection by e-mail, the contents of which are discussed in the opinion); and, *State v. Paumier*, 176 Wn.2d 29, 32-33, 288 P.3d 1126 (2012) (potential jurors questioned in judge's chambers, and it was recorded and transcribed). The fact that the sidebars in Effinger's case were not recorded, therefore, is inconsequential to our analysis and decision.

In reaching our conclusion, we have considered that the record preserves the bases for the jurors' dismissals.[4] Jurors 4, 6, 12, 18, 22, and 23, stated during voir dire that they could not be fair and impartial. Juror 13 discussed that members of her family were corrections officers and

---

[3] As noted previously, there are some discrepancies between the report of proceedings and the case information sheet. As an example, the case information sheet shows that juror 23 was excused for cause but this fact was not announced in court. Also, per the case information sheet, juror 35 was not reached, yet the court excused this juror in open court. The parties never objected to those excused jurors, and the parties agreed to the panel sworn in to hear the case.

[4] The dissent incorrectly interprets what we are saying. The record reflects the reasons potential jurors were excused, e.g. for cause, with a peremptory challenge, for hardship. Although the dissent postulates why some jurors were excused, there is nothing in this record to say with certainty those are the actual reasons. And knowing the actual reasons for dismissal is not a requirement of open courts jurisprudence. No case has previously made this criterion part of the test for open courts.

that she knew the prosecutor's sister. She stated these facts would not affect her ability to serve on the jury. Juror 13 also stated that she watched crime dramas but that she did not expect the trial to be like television. She later stated that she believed victims of domestic violence sometimes change their stories about what happened. Juror 13 was not then asked if anything discussed would impact her ability to serve.

Based on the foregoing and because we conclude there was no closure, we need not reach the third prong of the test. Effinger's ability to meaningfully participate in the voir dire process, to consult with his attorney about the jury venire, to participate in challenging jurors, or to understand the reasons jurors were dismissed was not compromised. Effinger's right to an public trial was fulfilled when the questioning of potential jurors and their answering occurred in open court, the striking of jurors occurred in open court at sidebar, and the recording of what happened was filed as part of the record. The trial court did not violate Effinger's right to a public trial.

II.      RIGHT TO BE PRESENT AT ALL CRITICAL STAGES

Effinger argues that the for cause and the peremptory challenge sidebars also violated his right to be present at all critical stages of his trial. We disagree.

"Our state and federal constitutions protect the right of a criminal defendant to be present 'at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.'" *Love*, 183 Wn.2d at 608 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)). "Jury selection is a critical stage of a criminal trial under both the state and federal constitutions." *Love*, 183 Wn.2d at 608.

In *Love*, Love asserted that his absence from the sidebar where the trial judge and counsel discussed and excused two jurors for cause violated his right to be present at critical stages of his trial. *Love*, 183 Wn.2d at 607-608. However, the court held that Love was present in the courtroom during all of voir dire, and nothing in the record suggested that Love could not consult with his attorney or otherwise meaningfully participate in the process. *Love*, 183 Wn.2d at 608.

Similar to the court's reasoning in *Love*, here, there is nothing in the record to demonstrate that Effinger was excluded from the courtroom or otherwise prevented from participating in jury selection. He was able to listen to the voir dire process and consult with his attorney about which jurors to challenge or to argue for their excusal. Following *Love*, we conclude that Effinger's right to be present was not violated.

We affirm the trial court.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

FACTS

On November 1, 2013, Jennifer Giovani, Effinger's wife, called 911 to report that Effinger threatened to kill her. She explained they had a history of domestic violence and she currently had a no contact order against Effinger. Deputy Thomas Tinsley responded to the call, and interviewed Giovani.

On October 31, Giovanni told Effinger she wanted to end their relationship. The next morning, she stated that Effinger hit her and told her if she went out with anyone else but him for her birthday, he would kill her. To protect herself, Giovani picked up a knife, which made Effinger leave. The police arrested Effinger three days later. He remained in custody.

10

In the meantime, Giovani contacted her friend, Cheryl Adams. Giovani asked permission to use Adams's physical address to receive letters from Effinger, who could then send Giovani letters from jail without obviously violating the no contact order. Adams agreed, and Effinger sent letters to Giovani under the alias Liz Adams. Police recovered at least three of these letters.

While Effinger was in jail, one of the administrative lieutenants received a complaint from a citizen that Effinger violated his no contact order with Giovani by calling Giovani directly from jail. Lieutenant Thompson reviewed the police reports and listened to Effinger's jail phone calls. She found two calls where she believed Effinger contacted Giovani. One call on November 11 was under Effinger's pin number,[5] and one call on November 13 was under a different inmate's pin number.

During Effinger's trial, Tinsley, Adams, and Thompson testified to the facts outlined above. During Thompson's testimony relating to Effinger's phone calls, the following exchange occurred between her and the prosecutor:

> [Prosecutor]: Did you believe that these calls were violations of the No Contact Order?
> [Thompson]: Yes, I did.
> [Prosecutor]: What about the calls made you believe that?
> [Thompson]: Well, there were several things. When I looked at the police report, the victim indicated that she was in the process of leaving Mr. Effinger. And in a recorded call—in one of the recorded calls, if not both — I can't remember — he basically begs her not to leave him. He indicates—about a minute into one of the calls, he calls her 'Jen.' You can barely hear it, but he says 'Jen,' and that's her first name, Jen or Jennifer. He also refers to her as his wife once during the phone call. And he talks about kissing his ring on his finger. And they also discuss something about a psych eval during both phone calls.

---

[5] The phone system at the jail designates a pin number for each inmate when he makes a call to someone outside the jail.

11

1 RP at 169-170. Thompson also testified that the male voice in both calls had a "certain quality" to it, which was "real panicky . . . . nasally, [and] might even at times have a lisp."  1 RP at 170. Effinger did not object.

After two days of trial, the jury found Effinger guilty of five counts of violation of a no contact order, three counts based on the letters and two counts based on recorded jail phone calls. The jury also rendered special verdicts on each conviction finding Effinger had been in a "family or household" with Giovani, Clerk's Papers (CP) at 56, 58, 60, 62, 64, making each conviction domestic violence related.  The jury acquitted Effinger of all other charges.

The trial court sentenced Effinger to 60 months of incarceration for each conviction to run concurrently.  The sentencing court imposed the mandatory LFOs and also imposed a discretionary $100 domestic violence assessment fee.  Effinger did not object.

ANALYSIS

I.    OPINION TESTIMONY

Effinger first argues that Thompson impermissibly opined that he violated the no contact order.  Because Effinger failed to object at trial, he must demonstrate that this alleged error is a manifest one that affects a constitutional right under RAP 2.5(a).  We conclude that Effinger failed to preserve this issue for appeal.

Effinger did not object at trial to Thompson's opinion testimony.  Generally, we do not consider issues raised for the first time on appeal.  RAP 2.5(a).  However, a claim of error may be raised for the first time on appeal if it is a "manifest error affecting a constitutional right."  RAP 2.5(a).  Exceptions to RAP 2.5(a) are construed narrowly.  *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).  "Pursuant to RAP 2.5(a)(3), to raise an error for the first time on appeal, the error must be 'manifest' and truly of constitutional dimension."  *Kirkman*, 159 Wn.2d at 926.  The

error is manifest by a showing of actual prejudice, i.e., that the alleged error actually had practical and identifiable consequences on the defendant's trial rights. *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015).

In the context of improper opinion testimony, a showing of actual prejudice requires "an explicit or almost explicit witness statement on an ultimate issue of fact." *Kirkman*, 159 Wn.2d at 936, 938. However, a defendant may fail to show actual prejudice if the jury is properly instructed that it is the sole judge of credibility of witnesses and that the jury is not bound by expert opinions. *State v. Montgomery*, 163 Wn.2d 577, 595, 183 P.3d 267 (2008); *Kirkman*, 159 Wn.2d at 937. Additionally, actual prejudice is not established if it is likely an objection would have been sustained or a jury instruction would have cured any error. *Montgomery*, 163 Wn.2d at 596; *Kirkman*, 159 Wn.2d at 935. Finally, if the jury is in a position to independently assess the evidence supporting an opinion for themselves, the likelihood of prejudice is reduced. *City of Seattle v. Heatley*, 70 Wn. App. 573, 581-82, 854 P.2d 658 (1993).

Here, the prosecutor asked Thompson whether she "believe[d] that these calls were violations of the No Contact Order?" 1 RP at 169. Thompson responded that she did. Reviewed in isolation, this exchange appears improper. In context, however, we conclude it is not. The prosecutor next asked what about the calls made Thompson believe that Effinger had violated the no contact order. Thompson replied with several reasons, including that she compared the content of the calls with the police report describing the incidents involving Effinger. She noted the male voice begged the female voice not to leave him and that the police report indicated Giovani was leaving Effinger. The male voice also addressed the female voice as "Jen" or "Jennifer," which is Giovanni's first name, and both phone calls discussed a psychological evaluation. 1 RP at 170. Thompson further described that the voice in the second phone call had the same quality as

13

Effinger's voice in the first phone call, which was nasally and had a lisp. The phone calls that Thompson described were admitted into evidence and played for the jury.

Effinger cites *State v. Jones*, 117 Wn. App. 89, 68 P.3d 1153 (2003), and *State v. Barr*, 123 Wn. App. 373, 98 P.3d 518 (2004), to support his argument that Thompson's opinion testimony was improper. In *Jones*, the court found an officer's testimony about the defendant's credibility when he questioned him during a traffic stop improper and prejudicial. 117 Wn. App. at 92. In *Barr*, the court also found an officer's opinion testimony improper and prejudicial where the officer testified that he had training to determine that the defendant's statements and body language indicated he had committed the offense. 123 Wn. App. at 382-83. Thompson, however, never opined directly about Effinger's credibility, as in *Jones*, and never testified that she had expert training to determine that Effinger was violating his no contact order, like in *Barr*.

We conclude that the testimony was not improper and, therefore, Effinger cannot meet his burden to show actual prejudice. Based on the totality of the circumstances, we conclude the testimony was not improper opinion testimony. In context, Thompson's testimony was to assist the jury in understanding the evidence, i.e., the phone calls. Like in *Heatley*, 70 Wn. App. at 579, the testimony was proper because Thompson did not testify as an expert on voices or on the content of the phone calls but gave detailed testimony from which the jury could assess her lay opinion.

Moreover, the jury was instructed that it was the sole judge of credibility of the witnesses. Even if this testimony was improper, it could have easily been cured with a curative instruction to disregard Thompson's testimony. Finally, the jury listened to both phone calls and independently assessed the weight to be given to the evidence. We conclude Effinger cannot show actual prejudice. Accordingly, we do not consider this issue further.

## II.    LEGAL FINANCIAL OBLIGATIONS

Effinger argues the trial court erroneously imposed the $100 domestic violence assessment fee,[6] a discretionary LFO, without first determining that he had the current or future ability to pay. He did not object at sentencing, and raises this issue for the first time on appeal. Pursuant to *State v. Blazina*, 182 Wn.2d 827, 832-33, 344 P.3d 680 (2015), we exercise our discretion and decline to review the imposition of Effinger's discretionary LFO, the domestic violence assessment fee.

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL

Effinger contends that he was denied effective assistance of counsel because his attorney failed to object to both Thompson's opinion testimony and the imposition of the LFOs at sentencing. We disagree.

### A.    Legal Principles

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on an ineffective assistance of counsel claim, the defendant must show both that defense counsel's representation was deficient, and that the deficient representation prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32–33, 246 P.3d 1260 (2011) (applying *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) test). Representation is deficient if after considering all the circumstances, it falls "'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d 17 at 33 (quoting *Strickland* 466 U.S. at 688). Prejudice exists if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have differed. *Grier*, 171 Wn.2d at 34. If a defendant

---

[6] RCW 10.99.080(1); RCW 10.01.160. RCW 10.99.080(1) was amended in 2015. LAWS OF 2015, ch. 265, § 24; LAWS OF 2015, ch. 275, § 14. These amendments do not affect our analysis in this opinion. RCW 10.01.160 was amended in 2015. LAWS OF 2015, 3rd sp. s. ch. 35 § 1. This amendment does not affect our analysis in this opinion.

fails to establish either prong, we need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996), *overruled on other grounds by Carey v. Musladin*, 549 U.S. 70, S. Ct. 649, 166 L. Ed. 2d 482 (2006).

We begin with a strong presumption that counsel's representation was effective. *Hendrickson*, 129 Wn.2d at 77. To demonstrate deficient performance the defendant must show that, based on the record, there are no legitimate strategic or tactical reasons for the challenged conduct. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). Trial counsel is given wide latitude in choosing trial strategy or tactics. *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 733, 16 P.3d 1 (2001). Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

"The decision of when or whether to object is a classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Therefore, we presume that "the failure to object was the product of legitimate trial strategy or tactics, and the onus is on the defendant to rebut this presumption." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Madison*, 53 Wn. App. at 763. To prove that failure to object rendered counsel ineffective, the defendant must show that (1) not objecting fell below prevailing professional norms, (2) that the proposed objection would likely have been sustained, and (3) that the result of the trial would have been different if the evidence had not been admitted. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

B.      Opinion Testimony

We conclude that defense counsel's failure to object was not deficient performance. We previously held that the challenged testimony was not improper; therefore, Effinger cannot

demonstrate that the objection would have been sustained or that the outcome of the trial would have been different.

C.    LFOs

Effinger also argues that his attorney's failure to object to the domestic violence assessment of $100 was both deficient and prejudicial.  To successfully assert prejudice in this context, Effinger must establish that the LFO would not have been imposed but for counsel's failure to object.  *State v. Lyle*, 188 Wn. App. 848, 853, 355 P.3d 327 (2015), *remanded*, 365 P.3d 1263 (2016).  Effinger has failed to establish that the discretionary LFO would not have been imposed.  Rather, the record demonstrates that despite Effinger being "in prison four times . . . he has a pretty good work ethic." RP (June 5, 2014) at 16.  In addition, Effinger did not present evidence that he had additional debt.  We conclude that even if Effinger proved his counsel's failure to object was deficient performance, he fails to demonstrate prejudice.

We affirm.

_____
Melnick, J.

I concur:

_____
Sutton, J.

17

BJORGEN, C.J. (dissenting) — The majority holds that considering juror challenges for cause at sidebar in a manner that prevents the public from hearing what is said and without any record of what transpired at the sidebar does not constitute a closure. Because this view is contrary to the rules and rationale undergirding the decision in in *State v. Love*, 183 Wn.2d 598, 354 P.3d 841 (2015), *cert. denied*, 136 S. Ct. 1524 (2016), I dissent.

The majority opinion sets out the basic three-step analysis used to examine public trial challenges and properly focuses on the second step, whether the challenged actions effectively closed the courtroom. On that issue, the Supreme Court noted in *Love* that

> [w]e have reversed convictions for two types of closures. The first, obvious type of closure occurs "when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011).
> . . . .
> The second type of closure occurs where a portion of a trial is held someplace "inaccessible" to spectators, usually in chambers. *Lormor*, 172 Wn.2d at 93, 257 P.3d 624.

*Love*, 183 Wn.2d at 606. The present appeal plainly does not involve physically closing the courtroom to spectators. Therefore, we must examine whether the second type of closure occurred.

In making that inquiry, the *Love* court used as touchstones the following purposes of the public trial right:

> The public trial right facilitates fair and impartial trials through public scrutiny. The public's presence in the courtroom reminds those involved about the importance of their roles and holds them accountable for misconduct. Effective public oversight of the fairness of a particular trial begins with assurance of the fairness of the particular jury.

*Love*, 183 Wn.2d at 606-07 (citations omitted). In holding that the challenges for cause at sidebar did not constitute a closure, *Love* relied on the following characteristics of the process:

> Yet the public had ample opportunity to oversee the selection of Love's jury because no portion of the process was concealed from the public; no juror was

18

> questioned in chambers. To the contrary, observers could watch the trial judge and counsel ask questions of potential jurors, listen to the answers to those questions, see counsel exercise challenges at the bench and on paper, and ultimately evaluate the empaneled jury. The transcript of the discussion about for cause challenges and the struck juror sheet showing the peremptory challenges are both publically available. The public was present for and could scrutinize the selection of Love's jury from start to finish, affording him the safeguards of the public trial right missing in cases where we found closures of jury se[le]ction. *See Wise*, 176 Wn.2d at 7-8, 288 P.3d 1113; *Paumier*, 176 Wn.2d at 33-34, 288 P.3d 1126.

*Love*, 183 Wn.2d at 607. The court held that with these procedures, no closure occurred. *Id.*

Many of these features were also present in Effinger's trial. Absent, however, was the one feature in *Love* that most directly insured effective public scrutiny and oversight, the purposes to which *Love* looked in determining whether a closure of the second type had occurred. In *Love* the discussion of juror challenges at sidebar was transcribed and publicly available. Here, no record was made of it.

By their nature, challenges for cause are made for specific reasons, those found in chapter 4.44 RCW. Challenges for cause thus contrast fundamentally with peremptory challenges, for which no reason need be given. *See State v. Marks*, 185 Wn.2d 143, 368 P.3d 485, *review denied*, (Feb. 10, 2016). Consequently, to meaningfully understand and scrutinize a for cause challenge, one must be able to ascertain any reasons given for the challenge. In *Love* that was possible because the exchanges at sidebar were transcribed and available to the public. Here, not only was no record of the sidebar made, but by its nature it was structured so others could not hear what transpired. The one phase of the process at which the reasons for challenges for cause would be offered, contested, and decided was, to the public, nothing but an inaudible pantomime. The case information sheet did nothing to fill this silence, because it said nothing about the reasons for the challenges for cause. Unlike *Love*, this approach offered no opportunity for

19

public scrutiny or oversight, considerations that are central in determining whether a closure of the second type occurred.[7]

The majority argues that deeming the sidebar in *Effinger* to constitute a closure would lead to an illogical conclusion: that court would be closed whenever a party challenged a juror for cause out loud in open court without stating a reason, if the challenge was granted without opposition. The flaw in Effinger's trial, however, did not lie in any failure to present a reason for a challenge. Rather, the flaw lay in barring the public from hearing or determining what reasons were offered for the challenges or whether any reasons were offered at all. When an oral challenge is made in open in court, nothing is hidden from the public; here, the public was placed in the dark as to whether any basis for a challenge was even presented. Simply allowing public scrutiny of the reasons or lack of reasons for a challenge in Effinger's circumstances does not mean that an oral challenge in open court without reasons works a closure.

The majority also contends that the reasons for each challenge for cause are apparent from voir dire, which was conducted in open court and recorded. I agree that the reasons for excusing jurors 4, 6, 12, 18, 22 and 23, were obvious from voir dire. Although not as clear, I think the reasons for excusing 13 are also reasonably discernable from voir dire. To preserve the purposes of the right, though, there must be some limit to the extent to which a closure of one phase may be saved by the ability to extract the same information from other, open phases.

---

[7] The majority argues that the presence of a record is not dispositive of whether an open court violation occurred, citing *State v. Brightman*, 155 Wn.2d 506, 511, 122 P.3d 150 (2005), *State v. Irby*, 170 Wn.2d 874, 887, 246 P.3d 796 (2011), *review denied*, (Feb. 10, 2016), and *State v. Paumier*, 176 Wn.2d 29, 33, 288 P.3d 1126 (2012). These cases all stand for the proposition that the presence of a record does not necessarily save a public trial or right to be present violation. They do not call into question, though, the importance of a record in finding there was not a closure, as in *Love*, or the importance of its absence in finding there was a closure, in cases such as this.

Without such limits, we would face the reductio ad absurdum of allowing any phase of trial to be effectively silenced as long as an observer could attend the entire trial or spend hours combing the record in an attempt to guess what was said at the silenced phase by inference from some other part of trial. The public's right to an open trial is not the same as the right to read the record of the trial at some later date. Nor is the exercise of that right contingent on attending the whole trial in an attempt to infer what might have been said at a closed phase from what was said at an open one.

Again, the purposes of the right to a public trial show the way around these shoals. As *Love* teaches, the presence of a written record together with other circumstances may save what otherwise would be an improper closure. To avoid these pitfalls, however, that record must be of the phase that arguably was closed, which was the case in *Love*. Without that limitation, effective exercise of the right would be contingent on presence at the entire proceeding or on the time and ability later to search the entire record for uncertain inferences. Therefore, the possibility of inferring the reasons underlying the challenges for cause from other parts of the record, such as voir dire, does not save the closed sidebar.

This is not to suggest, however, that any phase of trial may be silenced, as long as a record is made of it. The public's right to open trials is more than a public records measure. It guarantees rather the right to attend and to scrutinize the proceedings while present. *See Love*, 183 Wn.2d at 606-07. Outside the narrow circumstances of *Love*, that right would be lost if phases of trial were effectively reduced to a silent movie with written dialogue one could later look up. *See also Brightman*, 155 Wn.2d 506; *Irby*, 170 Wn.2d 874; *Paumier*, 176 Wn.2d 29.

*Love* established that we judge whether the second type of closure occurs by examining whether effective public scrutiny and oversight of the trial's fairness remains. As shown, little

21

survives of those interests by hearing and deciding challenges for cause during a sidebar of which no record is made.  Therefore, I would hold that this procedure constituted a closure.

_____, C.J.
BJORGEN, C.J.