**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56543-9-II |
| Respondent, | |
| v. | |
| NATHAN LOWELL ABBITT, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J. — Nathan Lowell Abbitt had his pants off in front of his two young stepdaughters, and the girls touched his penis until he ejaculated. After one of the girls disclosed the incident years later, the State charged Abbitt with two counts of first degree child molestation.

Before jury selection began, the trial judge addressed a pool of prospective jurors in the jury administration room. There, the trial judge read introductory instructions, placed the prospective jurors under oath, and handed out preliminary questionnaires. The parties later discussed excusing prospective jurors and conducted voir dire in open court.

In closing arguments at trial, the prosecutor repeatedly asked the jury to hold Abbitt accountable by convicting him. The jury then convicted Abbitt of both charges. The judgment and sentence included boilerplate language imposing community custody supervision fees.

Abbitt appeals. He argues that the proceeding in the jury administration room violated his right to a public trial. He further asserts that the prosecutor committed misconduct and that there

was insufficient evidence to convict him. He also contends, and the State concedes, that the community custody supervision fees must be stricken from his judgment and sentence.

We affirm Abbitt's convictions, but we accept the State's concession and remand for the trial court to strike the supervision fees.

## FACTS

### I. BACKGROUND

Abbitt began dating KB in 2010. The couple moved in together in 2011 and married in 2013. KB had two young daughters, EB and MB, who were approximately six years old and three years old when KB began dating Abbitt. Abbitt and KB had two more children together. The couple then separated in 2019. While dissolution proceedings were ongoing, EB told KB that Abbitt sexually abused her and MB years earlier. The State initially charged Abbitt with one count of first degree child molestation, then later added a second count.

### II. PRETRIAL PROCEEDINGS

Before jury selection began, the trial court informed the parties that there were 70 prospective jurors waiting in the jury administration room. The trial court intended to go down to the jury administration room to read the prospective jurors a preliminary instruction introducing the parties and explaining the process of a criminal trial. *See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.01 (5th ed. 2021) (WPIC). The trial court would also inform the prospective jurors of the charges, then place them under oath and have them complete a questionnaire addressing possible biases or hardships the prospective jurors would face if selected to serve on the jury. The trial court told the parties that they were "welcome to come down and watch." 1 Verbatim Rep. of Proc. (VRP) at 9. The trial court stated that it then expected

to discuss with the parties which prospective jurors they would excuse for hardship. Neither party objected to the trial court's suggested procedure. The parties also reviewed the questionnaire and other preliminary information that the prospective jurors would receive on the record in open court.

When the pool of prospective jurors assembled in the jury administration room, the trial court again informed the parties of its plan to read preliminary instructions, swear in the prospective jurors, and distribute questionnaires. The trial court stated, "[Y]ou're welcome to come down to [the jury administration room], if you wish, but you're not required to." 1 VRP at 43. Again, neither party objected.

The trial judge then went to the jury administration room. Neither party attended. Along with other courtroom staff, the judge introduced the court reporter to the prospective juror pool and explained, "She's over here diligently taking down everything that is said while court is in session. And we are currently in session on this case." 1 VRP at 48. The judge then read preliminary instructions about the process of a trial and explained the purpose and process of voir dire. The judge also placed the prospective jurors under oath and distributed a preliminary questionnaire.

That afternoon, the trial court and counsel reconvened in open court to discuss which prospective jurors they would excuse without individual questioning. The parties agreed to excuse 15 prospective jurors without further questioning based on their answers to the questionnaire. Only one prospective juror was excused for cause, and the others were excused for hardship. The juror excused for cause was excused because she was a victim of sexual assault and reported on the questionnaire that it would be difficult to "remove [her] experience from the facts" of the case. 1 VRP at 73. The parties agreed to excuse another prospective juror for hardship reasons before

noting that there was an "obvious bias" challenge as well. 1 VRP at 59. The trial court excused that juror for hardship. And the parties identified several other prospective jurors as having potential biases, but kept those jurors in the pool for further questioning.

The next day, the parties individually questioned prospective jurors about hardships they would face if they were to serve on a jury. The day after that, once individual questioning about hardships concluded, the trial court reread the same set of instructions it had read in the jury room to the remaining pool of prospective jurors, this time in the courtroom with the parties present. The trial court again placed the prospective jurors under oath before beginning formal voir dire to ask prospective jurors questions about their potential biases.

### III. TRIAL

A.      Evidence Presented

EB, who was in high school at the time of the trial, testified that the charged incident occurred one night when Abbitt was putting EB and MB to bed. EB believed that she was seven years old and MB was four years old at the time of the incident.

EB testified that the girls slept in bunk beds in a shared bedroom. That night, EB climbed onto Abbitt's shoulders from the top bunk, then down his body. She remembered Abbitt wearing jeans and a shirt. Abbitt's pants were down by the time EB reached the floor. EB testified that she and MB sat on the lower bunk bed and rubbed Abbitt's erect penis. Afterwards, there was something wet and sticky on her hands. Abbitt then left the room and never discussed the incident with the girls. MB had no recollection of the incident.

A forensic child interviewer, who interviewed EB, explained that delayed disclosures are common in child sex abuse cases. In particular, children frequently disclose abuse after the abuser has left the household or when there is a custody dispute.

Abbitt testified that on the night in question he put the girls to bed while wearing a towel wrapped around his waist. He stated that EB was 10 years old and MB was 7 years old at the time because he remembered that KB was pregnant with the couple's first child.[1] He testified that EB began roughhousing with him and that the towel fell from his waist while he was holding EB upside down. He said that MB poked at his penis and EB pulled on it for roughly 3 seconds. He also testified that KB walked in on the incident as it was occurring. And he denied ejaculating but said that he believed ejaculate could have leaked from his penis because he suffered from a "leaky plumbing" condition after years of withholding ejaculation, which he had discussed with KB. 7 VRP at 750.

KB testified that she never walked in on any scene where Abbitt had his penis exposed in front of her daughters. She also testified that Abbitt regularly ejaculated when they had sex, that he never mentioned any problem related to "'leaky plumbing'" and had full control of his ejaculatory response, and that he never told her that the girls saw his penis. 5 VRP at 567. And EB had no recollection of KB entering the room during the incident.

A detective, who spoke with Abbitt several times, testified that Abbitt repeatedly changed his assessment of how long the touching occurred, although he consistently maintained that it occurred for less than one minute. Although MB did not recall the incident, when Abbitt asserted

---

[1] The State amended the dates in the information to reflect the time period when Abbitt testified the incident occurred.

5

that he was a victim and the detective asked what charges he would like to file against the girls, Abbitt said, "'Penis touching on both of them.[2]'" 6 VRP at 687.

B.    Jury Instructions, Closing Arguments, Verdict, and Sentencing

The jury instructions emphasized that the attorneys' statements were not evidence and told the jurors to "disregard any remark, statement, or argument that is not supported by the evidence or the law in [the jury] instructions." Clerk's Papers (CP) at 39. The instructions explained that to convict Abbitt of first degree child molestation, the jury had to find beyond a reasonable doubt that Abbitt had sexual contact with EB and MB when they were less than 12 years old and were not married to him. *See* former RCW 9A.44.083(1) (1994).[3] The instructions stated, "Sexual contact means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party." CP at 48; *see* RCW 9A.44.010(13).[4]

At the beginning of closing argument, the prosecutor told the jury that because of EB's disclosure, "the State has been given the opportunity to prove the defendant's guilt." 8 VRP at 872. "Today, I ask you to hold [Abbitt] accountable for what he did to [EB] and [MB]." *Id*. The prosecutor then explained the elements of first degree child molestation. She also addressed the jury instructions and the evidence presented, including EB's stated reasons for her delay in disclosing the incident.

---

[2] The parties stipulated that this statement and others Abbitt made to the detective were admissible under CrR 3.5.

[3] The legislature has since removed the requirement that the defendant and victim not be married. LAWS OF 2021, ch. 142, § 5.

[4] We cite to the current version of the statute because the relevant language has not changed since Abbitt's offense.

While discussing the credibility of the witnesses, the prosecutor reminded the jury that they could consider witnesses' motives: "In this case, the defendant has the biggest motive to lie so that you don't find him guilty [and] so that you don't hold him accountable for what he did to these girls." 8 VRP at 880. She then explained how Abbitt's testimony was contradicted by other evidence and testimony, including his own prior statements. At the end of closing, the prosecutor reminded the jury that it was the trier of fact and contended that, "based on the facts and the law . . . the State has proven all of the elements beyond a reasonable doubt." 8 VRP at 889. "I am going to ask that you find Nathan Abbitt guilty as charged and hold him accountable for what he did to [EB] and [MB]." *Id*. Defense counsel did not object at any point during the State's closing argument.

Defense counsel's closing argument primarily emphasized the presumption of innocence and the State's burden of proof.

The State began rebuttal by discussing the jury instructions, arguing that Abbitt's leaky plumbing defense did not create a reasonable doubt about whether he was sexually gratified by the incident. The prosecutor emphasized that Abbitt had mostly corroborated EB's version of the incident. After asking the jurors to review their instructions, the prosecutor said, "Again, I'm going to ask that you hold Mr. Abbitt accountable for what he did to [EB] and [MB] and find him guilty." 8 VRP at 909. Defense counsel did not object.

The jury convicted Abbitt of both counts of first degree child molestation. At sentencing, the State sought, and the trial court imposed, a sentence of 75 months, near the middle of the standard sentencing range. The trial court stated that it would waive all nonmandatory legal

financial obligations. The judgment and sentence imposed mandatory legal financial obligations as well as community custody supervision fees. CP at 60, 62.

Abbitt appeals his convictions and sentence.

ANALYSIS

I. RIGHT TO A PUBLIC TRIAL

Abbitt argues that the trial court violated his state and federal constitutional right to a public trial when it "read the advance oral pattern jury instruction, including the details of Mr. Abbitt's case, and administered the oath to the jury venire" in the jury administration room, because there was "no indication" that the public had access to the jury administration room." Br. of Appellant at 35, 40. Abbitt contends that the trial court should have conducted a *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995), analysis on the record before beginning proceedings in the jury administration room and that failing to do so was reversible error. We disagree.

A.     Public Trial Principles

Both the state and federal constitutions guarantee criminal defendants the right to a public trial. U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 10, 22. In general, this right requires that certain proceedings be held in open court. *State v. Parks*, 190 Wn. App. 859, 864, 363 P.3d 599 (2015).

There are three steps to analyzing a claimed violation of the public trial right. "First, we ask if the public trial right attaches to the proceeding at issue. Second, if the right attaches we ask if the courtroom was closed. And third, we ask if the closure was justified." *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015). The defendant bears the burden of proof for the first two questions and the State bears it for the third. *Id.* For the State to justify a closure, the trial court

must either conduct a *Bone-Club* analysis or otherwise effectively weigh the defendant's public trial right against the interests favoring closure. *State v. Effinger*, 194 Wn. App. 554, 559-60, 375 P.3d 701 (2016).

The first step of the closure test requires assessing whether the right to a public trial attached to a proceeding. If a proceeding was not one that the Washington Supreme Court has already recognized the public trial right attaches to, we "must apply the experience and logic test to determine whether the public trial right is implicated." *State v. Miller,* 184 Wn. App. 637, 644, 338 P.3d 873 (2014). The experience and logic test asks whether a proceeding's "process and place . . . historically have been open to the press and general public," and "whether access to the public plays a significant positive role in the functioning of the proceeding." *Id*. "If the answer to both is yes, the public trial right attaches" and the court must consider the *Bone-Club* factors before closing the proceeding to the public. *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012). It is the defendant's burden to show that the public trial right attaches to a proceeding. *Love*, 193 Wn.2d at 605.

B.      When the Right to a Public Trial Attaches During Jury Selection

This court has explained that the public trial right does not apply "to every component of the broad 'jury selection' process," which "includes the initial summons and administrative culling of prospective jurors from the general adult public and other preliminary administrative processes." *State v. Wilson*, 174 Wn. App. 328, 338, 298 P.3d 148 (2013). Instead, the public trial right relates to *only* "the 'voir dire' of prospective jurors who form the venire (comprising those who respond to the court's initial jury summons and who are *not* subsequently excused administratively)." *Id*.

CrR 6.4(b) states that voir dire "shall be conducted for the purpose of discovering any basis for challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges." The rule does not mention excusing prospective jurors for hardship reasons.

In *State v. Russell*, the Supreme Court held that the public trial right did not attach to in-chambers work sessions to excuse potential jurors for hardship. 183 Wn.2d 720, 730, 357 P.3d 38 (2015). The Supreme Court noted that "[d]etermining whether a juror is able to serve at a particular *time* or for a particular *duration* (as in hardship and administrative excusals) is qualitatively different from challenging a juror's ability to serve as a neutral fact finder in a particular *case* (as in peremptory and for-cause challenges)." *Id*. at 730-31. The Supreme Court later elaborated that "hardship determinations do not implicate the concerns underlying the public trial right, at least where no juror was excused for hardship without further (on-the-record) proceedings." *State v. Schierman*, 192 Wn.2d 577, 608, 438 P.3d 1063 (2018) (lead opinion of McCloud, J.); *id.* at 747 (Madsen, J., concurring); *id.* at 763-64 (Yu, J., concurring/dissenting in part).

Division Three concluded that the defendant's public trial right did not attach to a proceeding similar to the one at issue in this case. *Parks*, 190 Wn. App. at 866-67. In *Parks*, the trial court "swore in the venire and gave the venire questionnaires in the jury assembly room because the venire would not fit in the courtroom." *Id*. at 862. Because the Supreme Court had not previously indicated whether the proceeding implicated a defendant's public trial right, Division Three applied the experience and logic test. *Id*. at 865.

For the first prong, whether a proceeding has historically been open to the public, the *Parks* court emphasized that it had not been able to find any case holding that "swearing in a venire has

historically been open to the public," or that "the public trial right attaches to any component of jury selection that does not involve 'voir dire' or a similar jury selection proceeding involving the exercise of peremptory challenges and for cause juror excusals." *Id*. at 866. Division Three further noted that the instruction read to the jury, WPIC 1.01, specifies that "it is to be read *before* the jury is selected and contains basic educational information the venire needs to know *before* voir dire begins." *Id*. And Division Three considered the reading of WPIC 1.01 to be analogous to "an administrative component of the jury selection process to which the public trial right does not attach." *Id*. at 866-67.

For the second prong, whether public access plays a significant role in the proceeding's function, Division Three held that Parks failed to demonstrate that "public access plays a significant positive role in the functioning of the swearing in a venire," that "swearing in a venire is a proceeding similar to the trial itself, or [that] openness during swearing in would enhance the basic fairness of his trial and the appearance of fairness." *Id*. at 867. Thus, Parks could not show that the public trial right attached to the challenged proceeding. The Supreme Court denied review. *State v. Parks*. 185 Wn.2d 1032, 377 P.3d 732 (2016).

C.      Whether the Public Trial Right Attached Here

Abbitt asserts, "[I]t is well settled that public trial rights apply to voir dire," which he contends included the challenged proceedings in both this case and in *Parks*. Reply Br. of Appellant at 13. He asserts that the trial court telling the prospective jurors "'we are currently in session on this case,'" constituted beginning voir dire. Br. of Appellant at 40. Because he believes voir dire began at this point, he insists that the public trial right automatically attached "and further inquiry is therefore unnecessary" because the trial court did not conduct a *Bone-Club* analysis

before going to the jury administration room. Reply Br. of Appellant at 13. He also argues that voir dire began in the jury administration room because the distributed questionnaire constituted "'juror questioning,'" because the parties agreed to excuse one prospective juror for cause due to her answers to the questionnaire. Reply Br. of Appellant at 21. We disagree.

1.      Whether the public trial right automatically attached

Abbitt has not carried his burden to establish that the public trial right automatically attached to the challenged proceeding in this case. First, the criminal rules establish that voir dire commences when jurors are questioned so that the parties may exercise peremptory and for-cause challenges. CrR 6.4(b). Formal voir dire—the process of questioning jurors to discover "any basis for challenge for cause" and to "enable an intelligent exercise of peremptory challenges"— occurred entirely on the record in open court in this case, as did any discussion of jurors' answers to the questionnaire, which were read aloud in open court if the juror was excused. *Id.* Although the prospective jurors received a preliminary oath in the jury administration room, voir dire had not yet commenced. Abbitt does not cite, and we cannot find, any Supreme Court case that holds that the public trial right automatically attaches to swearing in a pool of prospective jurors before they answer a questionnaire. Thus, this proceeding was not "within a specific category that our Supreme Court already has recognized for application of the public trial right." *Miller*, 184 Wn. App. at 644.

2.      Whether the public trial right attached under the experience and logic test

For purposes of analyzing whether the public trial right attached under the experience and logic test, the challenged proceeding in this case is very similar to the one in *Parks*. The trial court was on the record in the jury administration room when it read the same pattern instruction as the

court in *Parks* and a short summary of the charges, swore in the prospective jurors, and distributed questionnaires. *See* 190 Wn. App. at 864. The parties then met in open court to discuss which jurors they would excuse for hardship or bias based on their answers to the questionnaires and which of the jurors required more questioning. Like in *Schierman,* no juror was excused without discussion on the record, including a description of the questionnaire answer that led to the dismissal. *See* 192 Wn.2d at 608. Only one juror was excused for cause; both parties and the court agreed that her history as a victim of sexual abuse, and her written statement about why she could not separate her own experience from the facts warranted dismissal. Abbitt also asserts that two prospective jurors were dismissed for "a combination of hardship and bias" without questioning. Reply Br. of Appellant at 17. But one juror's bias was raised only after the parties had each moved to excuse them for hardship, and the trial court excused that juror for hardship, while two other potentially biased jurors were kept in the pool for additional questioning.

Abbitt argues that *Parks* is "fundamentally dissimilar" from his case "and legally flawed" because he believes that the proceeding in that case also constituted voir dire. Br. of Appellant at 43. We disagree.

The Supreme Court denied review of *Parks* and has not reviewed any case citing its reasoning that public trial rights do not attach when a judge swears in a pool of prospective jurors and distributes questionnaires. 185 Wn.2d 1032. As discussed above, Abbitt has failed to cite any precedent holding that the public trial right automatically attaches to swearing in prospective jurors before they fill out a questionnaire. Abbitt does not cite any case where a Washington court has held that the parties' discussions of hardship determinations implicate the public trial right. Indeed, the case law points to the contrary, with the Supreme Court holding that "hardship determinations

do not implicate the concerns underlying the public trial right" as long as jurors are excused on the record. *Schierman*, 192 Wn.2d at 608. Moreover, the parties' discussion of both the hardship excusals and the single excusal for cause based on written answers to the questionnaires, occurred on the record in open court. Therefore, we follow *Parks* and hold that the public trial right did not attach to the challenged proceeding in this case.

Abbitt also relies on *State v. Slert*, 181 Wn.2d 598, 608, 334 P.3d 1088 (2014) (plurality opinion), to argue that because the trial court placed the prospective jurors under oath, voir dire had begun. But in *Slert*, the parties agreed to dismiss four prospective jurors in an in-chambers conference. *Id.* at 602. In that case, the Supreme Court emphasized the drastic lack of information in the record about whether a courtroom closure had occurred, including whether voir dire had commenced. *Id*. at 608. Without such evidence, the justices who signed the lead opinion declined to infer that the proceeding constituted a courtroom closure. *Id*. Here, all discussions about the dismissals related to the questionnaires occurred on the record in open court before formal voir dire began the next day. Because we hold that the public trial right did not attach to the proceeding at issue here, we need not address whether a courtroom closure occurred.

## II. PROSECUTORIAL MISCONDUCT

Abbitt argues that the prosecutor's closing and rebuttal arguments improperly appealed to the passion and prejudice of the jury, constituting misconduct that violated his right to a fair trial. He reasons that asking a jury to hold a defendant accountable is similar to asking the jury to "'declare the truth'" by convicting the defendant. Br. of Appellant at 53 (quoting *State v. Anderson*, 153 Wn. App. 417, 429, 220 P.3d 1273 (2009) (holding that prosecutor's comments were improper but not prejudicial)). We disagree.

A criminal defendant's right to a fair trial "is guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution and under article I, section 22 of the Washington Constitution." *State v. Gouley*, 19 Wn. App. 2d 185, 200, 494 P.3d 458 (2021), *review denied,* 198 Wn.2d 1041, 502 P.3d 854 (2022). We review the prosecutor's challenged conduct "'in the context of the whole argument, the issues of the case, the evidence addressed in argument, and the instructions given to the jury.'" *Id.* (quoting *State v. Scherf*, 192 Wn.2d 350, 394, 429 P.3d 776 (2018)).

To demonstrate a violation of the right, a defendant who objected to a prosecutor's remarks need only show that the statements were improper and that there is a substantial likelihood the statements affected the verdict. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). When a defendant did not object to a prosecutor's remarks, they must show that the statements were flagrant and ill-intentioned as well as improper, that no curative instruction could have remedied the prejudice from the statements, and that there is a substantial likelihood the statements affected the verdict. *Id*. at 760-61. "In evaluating whether the defendant has overcome waiver in cases where an objection was not lodged, we will 'focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.'" *Gouley*, 19 Wn. App. 2d at 201 (quoting *Emery*, 174 Wn.2d at 762).

Where the defendant objected below, this court held that it was improper for a prosecutor to repeatedly ask a jury to "'declare the truth'" by convicting the defendant. *Anderson*, 153 Wn. App. at 429. However, the improper comments in *Anderson* did not require a new trial because they were made "in the context of jury instructions that clearly lay out the jury's actual duties and of thorough discussion of the evidence by both counsel during [closing] argument." *Id*. And

requests that the jury "'do[] justice'" and "return a 'just verdict'" were not improper, despite a defense objection, when the statements were "clearly made in the context of [pattern] jury instructions that explained what 'justice' would be." *Id.*

Here, the prosecutor asked the jury to hold Abbitt accountable four times, and defense counsel did not object to any of these statements. First, asking the jury to hold a defendant accountable is akin to asking the jury to find the defendant guilty, which is permissible. *State v. Jarvis,* No. 56086-1-II, slip op. at 20 (Wash. Ct. App. June 13, 2023)[5]. It's different from asking the jury "to declare the truth, which is akin to telling the jury that its role is to solve the crime and conduct an investigation, and is a misstatement of the jury's true duty of determining whether the State had proved its allegations against the defendant beyond a reasonable doubt." *Id.* "Asking the jury to hold a defendant responsible by finding them guilty in no way misstates the jury's duty." *Id.* Moreover, in context, the prosecutor's comments were based on the evidence presented at trial, argument about witness credibility, and the assertion that the State had carried its burden beyond a reasonable doubt.

In addition, viewing the prosecutor's comments in the context of the whole argument, evidence presented, and jury instructions, we conclude that any prejudice could have been remedied by an immediate curative instruction reminding "the jury that its purpose was to determine whether the State had met its burden to prove all the elements of the charged offenses." *Jarvis*, slip op. at 20-21. Further, the trial court's instructions to the jury clearly identified the burden of proof and the elements of first degree child molestation.

---

[5] https://www.courts.wa.gov/opinions/pdf/D2%2056086-1-II%20Published%20Opinion.pdf.

The trial court's instructions also warned that the attorneys' statements were not evidence and directed the jurors to "disregard any remark, statement, or argument that is not supported by the evidence or the law in [the jury] instructions." CP at 39. We presume that a jury followed the trial court's instructions, "absent evidence proving the contrary." *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). Abbitt has not demonstrated that the prosecutor's remarks were flagrant or ill intentioned, or that a curative instruction would not have remedied any ensuing prejudice. We hold that the prosecutor's remarks did not constitute misconduct.

### III. SUFFICIENCY OF THE EVIDENCE

Abbitt argues that the State did not offer sufficient evidence to prove that he acted for purposes of sexual gratification as required to convict him of first degree child molestation. He cites to cases from Wisconsin, Maine, and Massachusetts to argue that the State must prove "that the accused induced the contact or allowed the contact to occur for a prolonged period of time." Br. of Appellant at 27. He reasons that "uncontroverted evidence" showed that the incident lasted less than six seconds and that he "was disgusted at the idea of any sexual contact with children." Br. of Appellant at 31, 33. And he asserts that evidence he presented established that he did not have an erection, did not intentionally expose himself, and could not have stopped the children from touching him because he would have dropped EB on her head. We disagree.

As a preliminary matter, the State has asked us to strike or disregard evidence outside the record that Abbitt submitted with his opening brief, including several medical articles. Our record on review is limited to the report of proceedings, clerk's papers, and exhibits from the trial. RAP 9.1(a). We decline to consider the evidence Abbitt submitted that is outside this record.

To convict Abbitt of first degree child molestation, the jury had to find beyond a reasonable doubt that Abbitt had sexual contact with a child who was less than 12 years old. Former RCW 9A.44.083(1). "'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(13). Abbitt argues solely that the State failed to prove that the touching in the incident was for sexual gratification.

When addressing a claim of insufficient evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *State v. Dreewes*, 192 Wn.2d 812, 821, 432 P.3d 795 (2019). We take the State's evidence as true, and we consider circumstantial evidence equally reliable as direct evidence. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). "Further, we must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence." *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

EB testified that Abbitt removed his jeans and that she and MB sat on the lower bunk bed and touched his erect penis, which resulted in EB getting something wet and sticky on her hands. In contrast, Abbitt testified that he had been wearing a towel that EB pulled off while roughhousing with him, that the girls poked at and pulled on his penis before KB walked into the room, and that ejaculate may have leaked out of his penis because of a preexisting condition he claimed he had discussed with KB.

EB testified she did not remember KB walking in on the incident and KB testified that she had never found Abbitt with his penis exposed in front of the girls. KB also had no memory of Abbitt withholding ejaculation, having any problems with ejaculation, or mentioning leaking

ejaculate at any point during their nine-year relationship. Taking the State's evidence as true and drawing all inferences in the light most favorable to the State, a reasonable jury could have found that Abbitt had EB and MB, both undisputedly under the age of 12, touch his penis for Abbitt's sexual gratification. *See Dreewes*, 192 Wn.2d at 821. Thus, we hold that the State provided sufficient evidence to convict Abbitt of both counts of first degree child molestation.

## IV. SUPERVISION FEES

Abbitt argues, and the State concedes, that community custody supervision fees are discretionary fees that may be waived by the trial court. While Abbitt's case was pending on appeal, the legislature removed the authorization for trial courts to impose community custody supervision fees. *See* LAWS OF 2022, ch. 29, § 8. The statutory amendment eliminating community custody supervision fees became effective in 2022. The statutory amendment applies because Abbitt's case was still pending on review when the amendment became effective. *See State v. Ramirez*, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018). We accept the State's concession and remand for the trial court to strike the supervision fees.

## CONCLUSION

We affirm Abbitt's convictions, but we remand for the trial court to strike the supervision fees from Abbitt's judgment and sentence.

No. 56543-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Veljacic, J.

Che, J.