# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58643-6-II |
| Respondent, | |
| v. | |
| GREGORY LAMONT HUGHES-SIMMONS, JR., | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J. — Gregory Hughes-Simmons Jr. appeals his convictions for unlawful possession of a controlled substance with intent to deliver fentanyl while armed with a firearm, unlawful possession of a controlled substance with intent to deliver heroin, and unlawful possession of a firearm in the first degree. He raises several issues on appeal. First, he argues there was insufficient evidence to support the firearm sentencing enhancements. Second, he argues he received ineffective assistance of counsel because his counsel had a conflict of interest, would not call a critical defense witness, and could not present a complete defense. He also alleges he received ineffective assistance of counsel because his counsel failed to object to evidence regarding uncharged drug possession and failed to pursue an *Old Chief*[1] stipulation. Third, he

---

[1] *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997).

argues the court erred in not allowing counsel to withdraw on the basis of the alleged conflict of interest. Finally, he argues the trial court erred in refusing to consider his motion for a new trial.

We conclude that sufficient evidence supported the firearm sentencing enhancements, Hughes-Simmons does not show he received ineffective assistance of counsel, and the trial court did not err in denying counsel's motion to withdraw. We decline to consider Hughes-Simmons' claim that the trial court erred in declining to consider his motion for a new trial. Accordingly, we affirm.

FACTS

I. BACKGROUND[2]

In September 2021, Hughes-Simmons' supervising community corrections officer, Howard Chea, received evidence from a Lakewood Police Department detective that Hughes-Simmons had violated a condition of his community custody while under a Drug Offender Sentencing Alternative. Chea called Hughes-Simmons and told him to report to the Department of Correction's office. When Hughes-Simmons came in, Chea arrested him and placed him in the back of a Department of Corrections vehicle. Chea read Hughes-Simmons *Miranda*[3] warnings while he was in the backseat of the vehicle.

Chea assembled a team and drove to the house of Hughes-Simmons' girlfriend, Naquaisha Mays, to conduct a search. Officers searched the residence, and in a room containing men's clothing, cologne, shoes, and mail that was addressed to Hughes-Simmons, officers discovered a black 10"x12" safe. Officer Bryan Piek found a second safe in that room that was white. After

---

[2] This factual background is taken predominantly from testimony presented at trial.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

discovering the key to the white safe, officers opened it and found unknown yellow pills, a scale, and baggies. Piek informed Mays that they needed to open the black safe, and Mays then told him there was a firearm inside and that the contents of the safe belonged to her. Mays had the key to the black safe and opened it. Officer Ryan Hamilton stated that inside the safe was a .40 caliber firearm with a fully loaded magazine and a round in the chamber, five weapon magazines, fentanyl, heroin, pills believed to be ecstasy, Ziploc baggies, and scales.

Hamilton stated that once they began to place Mays in custody, Hughes-Simmons yelled from the car that "everything was his and that [Mays] had nothing to do with it. 2 Rep. of Proc. (RP) at 224. Mays then admitted that she loved Hughes-Simmons and was trying to protect him when she claimed possession of all the items in the safe. Hamilton read Hughes-Simmons *Miranda* rights again. Hamilton said that Hughes-Simmons then told him that the drugs and the gun were his. Hughes-Simmons told him he was selling pills in 100-quantity packs for $600. Hamilton also testified that

> [t]here was approximately a half ounce [of heroin]. And there was a smaller quantity that looked like it was prepackaged for sale. [Hughes-Simmons] said that that was his but that it had been found in a vehicle that he was using. He told me that the firearm was initially purchased or initially obtained by Ms. Mays but it was his now.

2 RP at 228.

Hughes-Simmons was then arrested and charged with two counts of unlawful possession of a controlled substance with intent to deliver fentanyl and heroin. Both counts had a firearm sentencing enhancement. Hughes-Simmons was also charged with unlawful possession of a firearm in the first degree.

3

II. MOTION TO WITHDRAW

Prior to trial, Hughes-Simmons' counsel, Dana Ryan, moved to withdraw based on the "conflict of interest" created by a witness's intended testimony and his ethical obligations to the court. 1 RP at 4. Counsel informed the court that after trying for 45 days to reach Mays, who was on the witness list, he finally spoke with her. Counsel stated,

> [B]ased upon what [Mays] told me, which was different than what was in the police report, a conflict arose under [Rules of Profession Conduct] RPC 3.3, which indicates that I have to basically present evidence, and I cannot present certain types of evidence before the tribunal.
>      My client and I are in disagreement on that. He wants her to testify, but based upon my conversation with her, I cannot get around the conflict of interest that has arisen.
>      . . . .
>      And when I talked to her, I indicated, the first thing I said is, "I'm Gregory Simmons-Hughes' attorney. I'm not your attorney. If you come here to testify in Pierce County and you testify consistent with what is in the police report, you have to be represented by counsel because that would subject you to potential criminal charges." And so as I explained that to her and how I would get an attorney for her and we started to talk about that, the conversation became problematic for me because of certain things that came out.

1 RP at 4-5.

The trial court asked Hughes-Simmons if he wanted to be heard on the motion to withdraw and he replied,

> I'm just lost, Your Honor. To be honest, I'm just lost and confused. I haven't been in contact with my attorney. I mean, I'm coming in in the dark, you know. I really don't—I just want to get this done, get this all figured out, settled, but I really have no—it doesn't bother me. I want to be able to have a fair trial if it does go to trial, you know, so that's why, I mean, whatever you got to do, you got to do.

1 RP at 8-9. Relying on *State v. Perra*, No. 83418-5-I (Wash. Ct. App. Mar. 21, 2022) (unpublished), http://www.courts.wa.gov/opinions/pdf/834185.pdf, the court stated that:

4

RPC [3.3(a)(4)] prohibits an attorney from presenting evidence that they know is false. RPC 3.3 let's an attorney refuse to offer evidence that the lawyer reasonably believes is false.

Every attorney has a special duty to prevent and disclose frauds upon the Court.

Thus, an attorney's loyalty is limited to legitimate lawful conduct and does not require taking steps or in any way assisting the client in presenting false evidence.

1 RP at 12-13.

The trial court denied Hughes-Simmons' counsel's motion to withdraw concluding:

Mr. Hughes-Simmons deserves timely justice, as does the State.

I have considered as well the fact that whoever the next attorney is may very well suffer the same ethical dilemma that you are, Mr. Ryan. There is no indication that, in fact, it will be any different.

So I have considered all of those things, and after having carefully considered all of those things and the Rules of Professional Conduct and the case cited and the cases that that case cites, I'm respectfully denying your motion for withdrawal.

1 RP at 14-15.

Also prior to trial, when going over motions in limine, Hughes-Simmons' counsel told the trial court that "[Hughes-Simmons] will not stipulate as to any prior convictions." 1 RP at 17.

### III. TRIAL

At trial, Hamilton testified regarding the contents of the black safe. RP (Feb. 28, 2023) at 236. Hamilton said that there was a bag of fentanyl pills not packaged for sale as well as five 100-count baggies of fentanyl that were prepackaged for sale and that this was consistent with what Hughes-Simmons had told him about selling the drugs. Hamilton testified that there was also approximately a half ounce of heroin which was more than a personal use amount as well as a separate, smaller packaged quantity that was consistent with a personal use amount and consistent with distribution. Hamilton stated that the Ziploc baggies and two scales found were both

consistent with packaging narcotics to sell and that firearm possession was also consistent with selling drugs for protection purposes and to prevent drugs from being stolen. He explained that in his experience "a lot of people who are selling drugs carry firearms for their own protection so that they are not robbed of their money or their product in what we call drug rips." 2 RP at 249. Detective Darin Sale testified that the firearm recovered was operable.

Hamilton stated twice during trial that he believed there were ecstasy pills found in the safe. Piek also testified that there were unknown yellow pills in the white safe. Hughes-Simmons' counsel did not object to this testimony. When the State moved to admit the exhibit of the alleged ecstasy pills, Hughes-Simmons' counsel objected on relevance grounds stating, "I don't believe my client has been charged with possession of ecstasy, so this would not be relevant to any of the charges at issue here. It would just be prejudicial." 2 RP at 239-240. The trial court sustained this objection and denied the motion to admit the alleged ecstasy pills because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

The State also moved to admit exhibits 20 and 21 as evidence of Hughes-Simmons' convictions from juvenile court for attempted residential burglary and unlawful possession of a firearm in the second degree. Defense counsel objected stating, "these [documents] are more prejudicial than probative, and I will leave it with that." 2 RP at 254. The trial court overruled the objection and admitted evidence of the previous convictions.

After both sides had rested, the State brought up the potential prejudice Hughes-Simmons might face due to his previous convictions being admitted. The State told the trial court that it had brought a redacted copy of exhibit 20 should the defense move to use that version instead of the previously admitted one.

The trial court stated that "[t]he defendant was offered an *Old Chief* stipulation. He declined that, and that's fine. That's his right to accept it. It's his right to decline it. . . . Both sides have rested. That said, if you—you are not asking to enter an *Old Chief* stipulation at this point?" 3 RP at 373. Defense counsel responded, "I should talk to my client about that, Your Honor. I didn't previously. I think that—I don't know if he really understood that analysis, and I'm not sure if we are too late in the game to do that." 3 RP at 373. The court responded, "You might be. Both sides have rested." 3 RP at 373.

The State clarified that it was just proposing a redaction. Exhibit 20 was withdrawn and exhibit 20A was admitted, which redacted Hughes-Simmons' conviction for unlawful possession of a firearm in the second degree.

The jury found Hughes-Simmons guilty of both counts of unlawful possession of a controlled substance with intent to deliver and found that he was armed with a firearm for both offenses. The jury also found him guilty of unlawful possession of a firearm in the first degree.

## IV. MOTIONS FOR A NEW TRIAL AND SENTENCING

At a sentencing hearing, defense counsel asked the trial court to appoint Hughes-Simmons new counsel. Hughes-Simmons expressed frustration regarding his retained counsel, stating,

> Your Honor, he has not given me no advice. He has been ineffective. He's not answering none of my phone calls. He complains about me giving him money, and that's what this whole conflict is. He is not working for me because I have not finished giving him the rest of the money, and I feel like he would not deserve the rest of the money because he has not given me adequate representation on this case.

6 RP at 445. The court orally stated that it would appoint the Department of Assigned Counsel to represent Hughes-Simmons.

Roughly six weeks later Hughes-Simmons filed a motion for a new trial pro se.

At another sentencing hearing some five weeks later, Hughes-Simmons was represented by counsel, John Cyr.[4] Hughes-Simmons moved the trial court to allow him to proceed pro se. After inquiring into why Hughes-Simmons wanted to represent himself and advising him of the disadvantages of self-representation, the court granted his motion. Sentencing was continued until September 8.

In early July, new counsel appeared on Hughes-Simmons' behalf. In late August Hughes-Simmons' new counsel filed a motion to continue sentencing again. The trial court denied this motion.

Just prior to the sentencing hearing, Hughes-Simmons' counsel filed a motion for a new trial pursuant to CrR 7.5(a), arguing that Hughes-Simmons received ineffective assistance of counsel at trial and that the court erred by holding a sidebar conference regarding the use of peremptory strikes without memorializing it on the record. The motion requested an extension of time under CrR 7.5(b), a new trial and, in the alternative, an evidentiary hearing to further develop the record. Attached to the motion was a declaration from defense investigator, Howard Hayes, who was hired to try to obtain the client file from Hughes-Simmons' trial counsel, Ryan. Hayes stated that after making contact, Ryan told him he would get the client file when he could and that "perhaps when he [Hughes-Simmons] sends me a check for trying his case I can get to it." Clerk's Papers (CP) at 139. The motion, including appendices totaled 356 pages.

At the sentencing hearing, defense counsel renewed the motion to continue sentencing, in part because defense counsel had not received the client file from Hughes-Simmons' prior counsel.

---

[4] It is unclear from the record whether Cyr was from the Department of Assigned Counsel or not.

The court denied this motion. The court also addressed the motion for a new trial and stated, "I'm not inclined to hear a motion for a new trial at this time based on the recent filing." 8 RP at 477.

The trial court sentenced Hughes-Simmons to 159 months of confinement and 12 months of community custody.

Hughes-Simmons appeals.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

Hughes-Simmons argues there was insufficient evidence to support his convictions on the firearm sentencing enhancements. We disagree.

A. Legal Principles

We review challenges to the sufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014). When reviewing a sufficiency of the evidence claim, we must determine "'whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.'" *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. This standard of review is deferential, "and questions of credibility, persuasiveness, and conflicting testimony must be left to the jury." *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011).

To prove a person is armed for purposes of the firearm sentence enhancement, "the State must prove (1) that a firearm was easily accessible and readily available for offensive or defensive purposes during the commission of the crime and (2) that a nexus exists among the defendant, the

weapon, and the crime." *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 826, 425 P.3d 807 (2018). To determine if there is a nexus between the defendant, the weapon, and the crime, we look "at the nature of the crime, the type of weapon, and the circumstances under which it was found." *Id.* at 827. "This nexus requirement is critical because '[t]he right of the individual citizen to bear arms in defense of himself, or the State, shall not be impaired.'" *State v. Neff*, 163 Wn.2d 453, 462, 181 P.3d 819 (2008) (quoting WASH. CONST. art. I, § 24.).

A defendant need not be armed at the time of arrest to be armed for the purposes of a firearm enhancement, and "the State need not establish with mathematical precision the specific time and place that a weapon was readily available and easily accessible, so long as it was at the time of the crime." *State v. O'Neal*, 159 Wn.2d 500, 504-05, 150 P.3d 1121 (2007).

Hughes-Simmons relies on *State v. Gurske*, 155 Wn.2d 134, 118 P.3d 333 (2005), in arguing he was not armed for purposes of the firearm sentencing enhancement. In *Gurske*, the defendant was arrested for driving with a suspended license. *Id.* at 136. The arresting officer searched Gurske's vehicle and found a backpack behind the driver's seat that contained an unloaded firearm, a firearm magazine, and methamphetamine. *Id.*

Gurske was charged and convicted of possession of a controlled substance while armed with a deadly weapon. *Id.* On appeal, the Washington Supreme Court reversed, concluding that when the officer stopped Gurske, there was no evidence that Gurske could readily remove the firearm from the zipped backpack, and there was no evidence he had easy access to use the firearm against someone while he was in possession of the drugs. *Id.* at 143-44.

However, in *Sassen Van Elsloo*, the court clarified that the mere proximity of the defendant to the firearm is not the salient question. *See* 191 Wn.2d at 826. In *Sassen Van Elsloo*, officers

searched Sassen Van Elsloo's vehicle and found numerous items consistent with drug sales, including a shotgun in the cargo hold, a large amount of drugs, baggies, and a digital scale. *Id.* at 802-03. Sassen Van Elsloo was charged with nine felony counts, five of which had firearm enhancements. *Id.* at 803.

On appeal, the Washington Supreme Court reiterated that the relevant question for purposes of the firearm sentencing enhancement is whether the firearm was "easily accessible and readily available for use for either offensive or defensive purposes." *Id.* at 826. The court stated that "when the crime is of a continuing nature, such as a drug operation, a nexus exists if the firearm is 'there to be used' in the commission of the crime." *Id.* at 828 (quoting *Gurske*, 155 Wn.2d at 138). The court ultimately found there was sufficient evidence to find a nexus between the shotgun and Sassen Van Elsloo's possession and distribution of drugs. *Id.* at 830. The court relied in part on the fact that the gun "was found less than a foot from the backpack, which contained the drugs[,]" the gun had a shell in the magazine and could be readily fired, and the gun was placed in the car in such a way that it could be quickly grabbed. *Id.*

B. Analysis

The State presented sufficient evidence that Hughes-Simmons was engaged in possessing illegal drugs with intent to deliver and was armed with a firearm. Here, unlike *Gurske*, Hughes-Simmons was charged with possession with intent to deliver rather than mere possession of a controlled substance. There is a significant difference between those crimes. Possession with the intent to deliver involves participation in activity in which, according to Hamilton's testimony, there is significant potential for violence. This is a matter of common understanding. Hamilton further testified that Hughes-Simmons told him the drugs and the firearm belonged to him and that

11

he was selling the fentanyl pills in 100-packs for $600. Hamilton also stated that the smaller packaged heroin found was consistent with an amount used for distribution purposes. Like *Sassen Van Elsloo*, the firearm was found right next to the drugs and the other instrumentalities of the drug selling operation. The firearm had a round in the chamber and was readily capable of being fired. Further, Hamilton testified that possession of a firearm was consistent with the sale of narcotics and that drug sellers would often carry firearms to defend against "drug rips," in which the seller is robbed of their money or drugs. 2 RP at 249.

Hughes-Simmons' suggestion that the gun's location in a locked safe demonstrates it was not readily available for offensive or defensive use is unpersuasive. Viewing the evidence in the light most favorable to the State, the firearm's presence in the location where the drugs and other instrumentalities of the operation were stored could lead a rational trier of fact to conclude that the firearm was "there to be used" in the commission of the drug sales. *See Sassen Van Elsloo*, 191 Wn.2d at 828. A rational trier of fact could also conclude that there was a nexus between Hughes-Simmons, the firearm, and the drug distribution. Accordingly, sufficient evidence supported the jury's verdict on the firearm enhancements.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Hughes-Simmons alleges he received ineffective assistance of counsel on three grounds. As we discuss below, we disagree with two of the contentions and decline to review the third.

To prove ineffective assistance of counsel, a defendant must show (1) counsel's representation was so deficient it fell "'below an objective standard of reasonableness'" and (2) that deficiency prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011) (quoting and applying test from *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.

Ct. 2052, 80 L. Ed. 2d 674 (1984)). Failure to satisfy either requirement defeats the claim. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024).

First, "[t]he defendant must overcome 'a strong presumption that counsel's performance was reasonable.'" *Id.* at 130 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel. *Kyllo*, 166 Wn.2d at 863. A "defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Specifically, to show ineffective assistance of counsel for failure to object, "a defendant must show that an objection would likely have been sustained." *State v. Fortun-Cebada*, 158 Wn. App. 158, 172, 241 P.3d 800 (2010). Further, "the decision 'to call a witness is a matter of legitimate trial tactics that presumptively does not support a claim of ineffective assistance of counsel.'" *In re Pers. Restraint of Quintero*, 29 Wn. App. 2d 254, 286, 541 P.3d 1007 (quoting *State v. Davis*, 174 Wn. App. 623, 639, 300 P.3d 465 (2013)), *review denied*, 3 Wn.3d 1018 (2024). "'A defendant can overcome this presumption by showing that counsel failed to adequately investigate or prepare for trial.'" *Id.* (quoting *Davis*, 174 Wn. App. at 639).

Second, prejudice requires showing that but for counsel's deficient performance, "there is a reasonable probability . . . the result of the proceeding would have differed." *State v. Estes*, 193 Wn. App. 479, 488, 372 P.3d 163 (2016). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012) (quoting *Strickland*, 466 U.S. at 694). "[T]he ultimate 'question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt

respecting guilt.'" *Bertrand*, 3 Wn.3d at 129 (quoting *Strickland*, 466 U.S. at 695). Therefore, "[p]rejudice exists when there is 'a probability sufficient to undermine [the court's] confidence in the outcome.'" *Id.* (alteration in original) (quoting *Strickland*, 466 U.S. at 694).

A. Alleged Conflict of Interest

First, Hughes-Simmons argues he received ineffective assistance of counsel because his counsel created a conflict of interest by not calling Mays to testify and failing to adequately present a defense. We disagree.

1. Legal Principles

Our court has recently addressed this issue in *Perra*, No. 83418-5-I, which the trial court here relied on. In *Perra*, trial counsel refused to call Perra as a witness because the defendant indicated he was going to present false testimony. *Id.*, slip op. at 4-5. This court held that there was no conflict of interest created by counsel's refusal to present false testimony, and that the RPC actually required counsel not to present this testimony. *Id.*, slip op. at 8-9. While *Perra* is unpublished and not binding, we find its sources and reasoning compelling.

Under RPC 3.3(a)(4), an attorney is prohibited from presenting evidence they know to be false. RPC 3.3(e) lets an attorney "refuse to offer evidence that the lawyer reasonably believes is false." An attorney's duty of loyalty to their client is "limited to legitimate, lawful conduct" and does not require "taking steps or in any way assisting the client in presenting false evidence." *Nix v. Whiteside*, 475 U.S. 157, 166, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986). Therefore, "a defendant has no legitimate interest that conflicts with [their] attorney's obligation not to tolerate perjury and to adhere to the Rules of Professional Conduct." *State v. Berrysmith*, 87 Wn. App. 268, 277, 944 P.2d 397 (1997).

2. Analysis

Here, Hughes-Simmons cannot show that counsel's refusal to call a witness who he believed was going to present false testimony was deficient performance. Despite trial counsel's characterization of his refusal to call Mays to testify as a "conflict of interest," it was not. 1 RP at 4. Pursuant to RPC 3.3(a)(4), Hughes-Simmons' trial counsel was prohibited from offering testimony he knew to be false, and under RPC 3.3(e), he was allowed to refuse to offer testimony he reasonably believed to be false. Counsel based his conclusion that Mays would present false testimony on the conversation he had with her and what she told him she was going to testify to at trial. Hughes-Simmons fails to show how counsel's belief based on this conversation was unreasonable. Hughes-Simmons fails to demonstrate how counsel's adherence to the RPC created a legitimate conflict between himself and defense counsel, as a defendant has no legitimate interest that conflicts with their attorney's obligation to adhere to the RPC. Further, the decision to call a particular witness lies within the discretion of trial counsel, and Hughes-Simmons fails to show that his counsel did not adequately investigate or prepare for trial. Therefore, his ineffective assistance of counsel claim due to an alleged conflict of interest created by counsel's refusal to call a witness fails.

B. Uncharged Possession of Ecstasy

Second, Hughes-Simmons argues he received ineffective assistance of counsel because his counsel failed to object to testimony regarding his alleged unlawful possession of ecstasy that was not charged. We disagree.

Even if Hughes-Simmons could show deficient performance, he cannot show prejudice. Despite counsel's failure to object to three instances of testimony regarding the ecstasy pills,

counsel did object to the admission of the ecstasy pills being admitted as evidence. Further, this testimony did not overshadow the overwhelming evidence against Hughes-Simmons, including Hamilton's testimony that Hughes-Simmons confessed to owning the contents of the black safe and selling drugs and his testimony regarding the drugs, firearm, baggies, and scales as evidence consistent with drug sales. Therefore, Hughes-Simmons cannot show the result of the proceeding would have differed had his counsel objected to the testimony regarding the ecstasy.

C. *Old Chief* Stipulation

Third, Hughes-Simmons alleges he received ineffective assistance of counsel because counsel did not request an *Old Chief* stipulation. We disagree.

1. Legal Principles

Under RCW 9.41.040(1)(a), a person commits unlawful possession of a firearm in the first degree "if the person owns, accesses, has in the person's custody, control, or possession, or receives any firearm after having previously been convicted . . . in this state or elsewhere of any serious offense." "'The existence of a constitutionally valid prior conviction is an essential element of the offense, one the State must prove beyond a reasonable doubt.'" *State v. Lopez*, 107 Wn. App. 270, 276, 27 P.3d 237 (2001) (quoting *State v. Reed*, 84 Wn. App. 379, 384, 928 P.2d 469 (1997)).

"In *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997), the United States Supreme Court recognized the prejudicial effect that evidence of a defendant's prior conviction may have on the trial." *State v. Streepy*, 199 Wn. App. 487, 502, 400 P.3d 339 (2017). Accordingly, the Court announced that "a trial court abuses its discretion when it fails to accept a [defendant's] stipulation to a prior conviction upon [the defendant's] request." *State v. Humphries*,

181 Wn.2d 708, 717, 336 P.3d 1121 (2014) (emphasis omitted). "The most the jury needs to know

is that the conviction admitted by the defendant falls within the class of crimes that [the legislature]

thought should bar a convict from possessing a gun." *Old Chief*, 519 U.S. at 190-91.

2. Analysis

Here, Hughes-Simmons' counsel did not request an *Old Chief* stipulation and indicated,

after both sides had rested, that he had not gone over the potential for such a stipulation with his

client. Hughes-Simmons stipulating to previous unnamed convictions could have kept his

convictions for attempted residential burglary and unlawful possession of a firearm in the second

degree from reaching the jury through testimony. On the other hand, the decision whether to offer

an *Old Chief* stipulation is a tactical one entrusted to defense counsel. *See, e.g.*, *Streepy*, 199 Wn.

App. at 504. The risk of offering an *Old Chief* stipulation is obvious: the jury is liable to speculate

about the crime the defendant committed. The jury might speculate that it is a far more serious

crime than the actual conviction, which could be detrimental to the defendant. Allowing the jury

to hear what the actual conviction was prevents the risk of this type of speculation. As there are

potential advantages and disadvantages to any decision in this situation, we will not second guess

trial counsel's decision on this matter.

However, even if Hughes-Simmons could show that counsel performed deficiently by

failing to request an *Old Chief* stipulation, Hughes-Simmons cannot show prejudice resulting from

counsel's failure to do so, as there was overwhelming evidence supporting his conviction. Nothing

suggests that the proceeding would have differed had the jury not been told the specific nature of

Hughes-Simmons' previous convictions because even if that evidence had come in under an *Old

Chief* stipulation, the jury could still rely on Hughes-Simmons' own statements to Hamilton that

the drugs and the firearm were his and that he sold the drugs. The jury could also rely on Hamilton's testimony regarding the drugs, firearm, baggies, and scales as evidence consistent with drug sales. Accordingly, we conclude Hughes-Simmons has failed to show prejudice and, therefore, failed to show that he received ineffective assistance of counsel.

### III. MOTION TO WITHDRAW

Hughes-Simmons argues the trial court erred in denying counsel's motion to withdraw based on trial counsel's perceived "conflict of interest." Br. of Appellant at 52. We disagree.

#### A. Legal Principles

We "review RPC conflict issues, and related motions to withdraw, de novo." *State v. O'Neil*, 198 Wn. App. 537, 542, 393 P.3d 1238 (2017). While withdrawal is usually left to the trial court's discretion, "whether a conflict exists requiring withdrawal is a question of law." *Id.* at 543.

#### B. Analysis

Here, as explained above, there was no actual conflict of interest requiring Hughes-Simmons' counsel to withdraw. Hughes-Simmons had no legitimate interest that conflicted with his attorney's obligation to adhere to the RPC. Therefore, the trial court did not err in denying counsel's motion to withdraw.

### IV. MOTION FOR A NEW TRIAL

Hughes-Simmons argues the trial court erred in refusing to consider his motion for a new trial. Because Hughes-Simmons presents inadequate briefing on this assignment of error, we decline to consider his argument.

RAP 10.3(a)(6) requires that an appellate brief contain "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of

the record." We "will not consider claims insufficiently argued by the parties." *State v. Elliott*, 114 Wn.2d 6, 15, 785 P.2d 440 (1990); *Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) ("We will not consider an inadequately briefed argument.").

Here, Hughes-Simmons has failed to identify the appropriate standard of review, failed to indicate whether this error is subject to harmless error analysis, and failed to cite apposite legal authority[5] supporting his argument for why the trial court erred in not considering his motion for

---

[5] The section of Hughes-Simmons' brief related to this assignment of error contains citation to one authority: *In re Pers. Restraint of Fowler*, 197 Wn.2d 46, 50, 479 P.3d 1164 (2021) (holding that equitable tolling was warranted to allow petitioner time to file a personal restraint petition due to the misconduct of his previous counsel). This authority, however, is not relevant to Hughes-Simmons' argument regarding the trial court's consideration of an untimely filed motion for a new trial.

a new trial. His failure to provide relevant citations to legal authority supporting his argument is fatal to his claim, and we decline to address its merits.[6]

CONCLUSION

Sufficient evidence supported the firearm sentencing enhancements. Hughes-Simmons fails to show he received ineffective assistance of counsel, and the trial court did not err in denying counsel's motion to withdraw. Further, we decline to consider his argument that the trial court erred in refusing to consider the motion for a new trial. Accordingly, we affirm.

---

[6] If we were to address the merits of this claim, we note that CrR 7.5(b) requires that the motion be brought within ten days of the verdict. The jury returned guilty verdicts on March 3, 2023. Hughes-Simmons initially filed this motion on May 15, but failed to pursue it by asking for a hearing. Then, almost four months later, on the date set for sentencing, Hughes-Simmons' new counsel filed a new motion for a new trial. One of the arguments set forth in the motion is also raised in this appeal, namely whether trial counsel was ineffective in failing to call Mays as a witness. We conclude in this opinion that Hughes-Simmons has not demonstrated ineffective assistance of counsel. The second argument raised in the motion for new trial is that the trial court erred in conducting a side bar conference during voir dire without later memorializing for the record what was discussed at the sidebar. To the extent Hughes-Simmons argues his right to a public trial was violated, there was no closure here where the parties struck jurors at a sidebar that was not memorialized. In *State v. Effinger*, we held that there was no closure where parties exercised peremptory and for cause strikes at a sidebar that was not transcribed. 194 Wn. App. 554, 561-62, 375 P.3d 701 (2016); *see also State v. Love*, 183 Wn.2d 598, 606-07, 354 P.3d 841 (2015). The conclusion was based on that fact that the record included the case sheet showing which jurors were excused, the questioning of potential jurors took place in open court in front of everyone, no one was asked to leave the courtroom, and the jury was empaneled in open court. *Effinger*, 194 Wn. App. at 561-62; *Love*, 183 Wn.2d at 606-07. Similarly, here, while we do not have the jury selection sheet in the record before us, the questioning of potential jurors took place in open court, no one was asked to leave the courtroom, and the jury was empaneled in open court. Therefore, we conclude there was no closure, and Hughes-Simmons' has not demonstrated that his right to a public trial was violated.

No. 58643-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered

CRUSER, C.J.

We concur:

VELJACIC, J.

BIRK, J.[7]

---

[7] Judge Birk is serving in Division Two of this court pursuant to RCW 2.06.040.